UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

RONALD NORMAN DYE,

                Plaintiff,

-vs-                              Case No.  5:04-cv-215-Oc-10GRJ

WILL RADCLIFF, individually, R. KEVIN
STEINKE, individually and as an officer for
the Florida Fish and Wildlife Conservation
Commission, JEFF HAHR, Lieutenant,
individually and as officer for the Florida
Fish and Wildlife Conservation, BRYAN M.
LAMBERT, Officer, individually and as
officer for the Florida Fish and Wildlife
Conservation Commission, MIKE FISHER,
Officer, individually and as officer for the
Florida Fish and Wildlife Conservation
Commission, FLORIDA FISH AND
WILDLIFE CONSERVATION
COMMISSION,

                Defendants.

_____

## **O R D E R**

      This case is before the Court for consideration of Defendant Will Radcliff's Motion

for Summary Judgment (Doc. 39), to which the Plaintiff has responded (Doc. 49).  The

motion is ripe for review and the Court concludes that it is due to be granted in part, and

the remaining state law claims are due to be remanded to the state court.

## PROCEDURAL BACKGROUND

On April 29, 2004, the Plaintiff filed this action against the Defendants in state court. The action was removed to this Court on May 26, 2004 (Doc. 1).  On November 29, 2004, the Court dismissed the Plaintiff's negligent employment and supervision claim (Doc. 21). And on July 8, 2005, the Court dismissed the Plaintiff's claims against the Florida Fish and Wildlife Conservation Commission, R. Kevin Steinke, Jeff Hahr, Bryan M. Lambert, and Mike Fisher pursuant to the Parties' stipulation for dismissal (Doc. 53).  Accordingly, the claims to be considered on summary judgment against the sole remaining Defendant, Will Radcliff, are the Plaintiff's § 1983, defamation, intentional infliction of emotional distress, malicious prosecution, and conspiracy claims.

## BACKGROUND

Plaintiff Ronald Norman Dye was terminated from his employment at the Fly'n R Ranch, owned by Will Radcliff,[1] because Mr. Radcliff "was going out of the cattle business."[2]  On November 16, 2000, Mr. Radcliff notified Mr. Dye of his termination and warned Mr. Dye "not to enter the property of the company for any reason whatsoever after

---

[1]     Doc. 32, Part 3, Appendix 2, Defendant Will Radcliff's Answers to Interrogatories, pg. 11.

[2]     Doc. 36, Deposition of Ronald Dye, pg. 6, 109-10.

2

November 17, 2000."[3]  Mr. Radcliff further warned that "he will report all trespasses to the proper authorities."[4]

R. Kevin Steinke, a law enforcement officer with the Florida Fish and Wildlife Conservation Commission (the Commission), was assigned to work in a region which included Emeralda Marsh, a grassy marsh east of the Ocklawaha River.[5]  Mr. Radcliff's Fly'n R Ranch encompassed a substantial area of the Emeralda Marsh, including a narrow slough or passage of water about 200 feet across known as the "Narrows."[6]

Officer Steinke testified that prior to December 2001 the Commission received complaints from Will Radcliff and his ranch manager, Larry Gerhardt, about people hunting on Mr. Radcliff's property.[7]  Mr. Radcliff specifically complained about Ronald Dye and his son, Keith Dye.[8]

On December 1, 2001, Officer Steinke and another officer, Brian M. Lambert, were patrolling on foot on Mr. Radcliff's property because they had received some information

---

[3]     Doc. 32, Part 8, Appendix 7, Letter from John C. Trentelman, Will Radcliff's Attorney, Dated November 16, 2000; Doc. 36, Deposition of Ronald Dye, pg. 45, 90.

[4]     Doc. 32, Part 8, Appendix 7, Letter from John C. Trentelman, Will Radcliff's Attorney, Dated November 16, 2000.

[5]     Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 2.

[6]     Id.; Doc. 37, Deposition of Keith Dye, pg. 39-40; Doc. 36, Deposition of Ronald Dye, pg. 22.  Mr. Dye admits in his deposition that the Narrows (the area where he was stopped on December 1, 2001) is within the property boundary lines of the Fly'n R Ranch.

[7]     Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 3.

[8]     Id.

that the former ranch manager and his son were illegally hunting on the backside of the ranch.[9]  While on patrol, the officers heard an airboat at about 6:30 a.m. and they also heard a number of gunshots.[10]  Eventually, an airboat came into the Narrows, and Officer Steinke recognized the driver as Keith Dye and the passenger as Keith's father, Ronald Dye.[11]  At Officer Steinke's request, the airboat came to a stop.[12]  Officer Steinke saw two deer in the boat and requested to see Ronald and Keith Dye's hunting licenses.[13]  Keith Dye did not produce a license.[14]  Keith indicated to Officer Steinke an area where he had been hunting, but based upon the direction from which Officer Steinke heard the gunshots fired, Officer Steinke did not believe that Keith was being truthful.[15]  Officer Steinke, along with Officers Mike Fisher and Lieutenant Jeff Hahr, who arrived on the scene after the Dyes were stopped, went with Keith Dye to the locations where Keith claimed he was hunting with his father.[16]  They returned to the Narrows and Keith was cited for hunting without a

---

[9]     Id.; Part 6, Affidavit of Officer Brian M. Lambert, pg. 2; Doc. 50, Appendix 4, Florida Fish and Wildlife Conservation Commission Incident Report Narrative.

[10]     Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 3; Part 6, Affidavit of Officer Brian M. Lambert, pg. 2.

[11]     Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 3-4.

[12]     Id. at pg. 4.

[13]     Id.

[14]     Id.; Part 6, Affidavit of Officer Brian M. Lambert, pg. 2.

[15]     Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 4.

[16]     Id.; Part 6, Affidavit of Officer Brian M. Lambert, pg. 2.

4

license.[17]  The Dyes were advised that the officers were going to pursue an investigation to determine if they had been trespassing,[18] and both Keith and Ronald Dye were then permitted to leave.[19]

The officers suspected that Keith Dye was not honest about the number of deer he shot, so the officers decided to search the marsh area where they heard the shots fired earlier that day.  During the search, they found a freshly killed four point buck lying in the marsh grass and a freshly killed nine point buck on the edge of the tree line.[20]  Both deer were found near but outside the Narrows, and within the boundaries of Mr. Radcliff's Fly'n R Ranch.[21]  The officers took G.P.S.[22] coordinates of the location of the fallen deer.[23]

---

[17]    Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 4.

[18]    Doc. 50, Appendix 4, Florida Fish and Wildlife Conservation Commission Incident Report Narrative.

[19]    Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 4.

[20]    Id. at pg. 4-5; Part 5, Affidavit of Lt. Jeff Hahr, pg. 3.

[21]    Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 5; Part 5, Affidavit of Lt. Jeff Hahr, pg. 3; Doc. 37, Deposition of Keith Dye, pg. 48.

[22]    G.P.S. is an abbreviation for Global Positioning System.

[23]    Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 5; Part 5, Affidavit of Lt. Jeff Hahr, pg. 3.

Thereafter, the officers went to Keith Dye's home, where he admitted to killing the two additional deer.[24]  Keith was then cited for "Taking Over the Daily Bag Limit of Deer."[25]

Later that same day, Ranch Manager Larry Gephardt informed the officers that the Narrows was within the boundary of the Fly'n R Ranch and that Mr. Radcliff wanted to pursue trespass charges against the Dyes.[26]  In response, Officer Steinke investigated the case further to determine if trespassing charges against the Dyes should be pursued. Officer Steinke met with Larry Duke from the Lake County Geographic Information System Division to plot the G.P.S. coordinates on an aerial photograph so that it could be determined whether the deer and the Dyes were on Fly'n R Ranch property on December 1, 2001.[27]  The aerial photograph with the plotted coordinates showed that the deer and the Dyes were within the property boundaries of Fly'n R Ranch.[28]  During the investigation, Officer Steinke, along with two other officers, also examined the deer shot by Keith Dye.[29] In addition, Officer Steinke contacted Terry Wilkinson, who was the Chief of the Department of Environmental Protection's Bureau of Surveying and Mapping and the State

---

[24]    Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 5.

[25]    Id.

[26]    Id.; Part 6, Affidavit of Officer Brian M. Lambert, pg. 3.

[27]    Doc. 50, Appendix 5, Follow Up Florida Fish and Wildlife Conservation Commission Incident Report Narrative.

[28]    Id.

[29]    Id.

Cadastral Surveyor, to determine whether location in the Narrows where the deer were found and where the Dyes were stopped were navigable waters.[30]  If the lands were beneath the navigable waters, the lands would be considered "sovereignty lands" which are owned by the state in trust for the benefit of the people of the state, and the Dyes could not be guilty of trespassing on private land.[31]

---

[30]     Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 6; Part 7, Affidavit of Terry Wilkinson, pg. 2.

[31]     See Doc. 32, Part 6, Appendix 5, Letter from Jonathan A. Glogau, Assistant Attorney General, Florida Office of the Attorney General, dated January 3, 1996.  In the letter, Mr. Glogau explains to State Attorney Lawson Lamar the concept of sovereignty lands and what procedure should be followed by the State Attorney's Office prior to prosecuting an individual for trespassing on lands that may be publicly owned.  In part, the letter states:

> Sovereignty lands are those lands beneath the navigable waters of the state which are owned by the state in trust for the benefit of the people of the state. The legal title holder of this land is the Board of Trustees of the Internal Improvement Trust Fund (The Governor and Cabinet) and the lands are administered by the Trustees' staff in the Division of State Lands, Department of Environmental Protection.
> . . .
>
> It has been brought to our attention that a situation exists in central Florida where members of the public can be arrested for trespassing on lands that constitute sovereignty submerged lands because they lie below the ordinary high water mark of navigable waters. . . A decision to prosecute necessarily involves a determination by your office that the defendant was on private land.
>
> The question of whether particular lands are state owned public lands is one which can only be decided by the staff of the Trustees in the first instance. Controlling case law holds that only authorized personnel cam make a determination concerning state ownership of sovereignty lands.  We believe that when a situation as described arises, the state cadastral surveyor [Terry Wilkinson] is that authorized official and he should be contacted for a determination of whether the location where the arrest took place was indeed

(continued...)

7

On January 15, 2002, Terry Wilkinson, the state official charged with determining whether property is sovereignty submerged lands, inspected the site where Ronald and Keith Dye were stopped on December 1, 2001.[32]   Both Commission officers and Ranch Manager Larry Gerhardt were present during Mr. Wilkinson's inspection, and at that time Mr. Gerhardt again made it clear that Mr. Radcliff wished to pursue trespassing charges against the Dyes.[33]

Mr. Wilkinson testified that prior to December 1, 2001, the date the Dyes were stopped in their airboat, the ordinary high water mark in the Narrows had not been established and the navigability of the Narrows had not been determined.[34]  Mr. Wilkinson concluded that "the site where . . . Ronald and Keith Dye were stopped on December 1, 2001 is a non-navigable slough and not state owned sovereignty land."[35]  Mr. Wilkinson further concluded "that there was no navigable channel in the vicinity of the Narrows and

---

[31](...continued)
    on sovereignty submerged lands.  Only after a determination by that official that the location is not on land owned by the state should a prosecution be instigated.

[32]    Doc. 34, Part 7, Affidavit of Terry Wilkinson, pg. 2; Doc. 50, Appendix 5, Follow Up Florida Fish and Wildlife Conservation Commission Incident Report Narrative.

[33]    Doc. 50, Appendix 5, Follow Up Florida Fish and Wildlife Conservation Commission Incident Report Narrative.

[34]    Doc. 34, Part 7, Affidavit of Terry Wilkinson, pg. 3.  Mr. Dye concurs with this fact. See Doc. 36, Deposition of Ronald Dye, pg. 28.

[35]    Doc. 34, Part 7, Affidavit of Terry Wilkinson, pg. 2; see also Doc. 32, Part 7, Appendix 6, Letter from Terry E. Wilkinson, Chief of the Bureau of Surveying and Mapping, Division of State Lands, dated April 5, 2002.

that the open (and navigable) water of the Ocklawaha River is over a mile from the Narrows."[36]

Upon receiving Mr. Wilkinson's opinion, Officer Steinke forwarded the case to the State Attorney's Office and provided the State Attorney with a copy of his reports regarding the December 1, 2001 incident involving the Dyes, a copy of Mr. Wilkinson's letter setting forth his opinion as to the status of the lands, and copies of the trespass warning sent by Mr. Radcliff to Mr. Dye.[37]

Mr. Dye disputes Mr. Wilkinson's opinion and claims that the Narrows was navigable water on December 1, 2001.[38]  During his deposition, Mr. Dye stated that:

> [The Narrows are] part of the headwaters of the Ocklawaha River.  Part of the Marsh that builds the Ocklawaha River, the water that flows through the marshes, and through this pass is the only way the water can go to the river, and that's navigable one way or the other as long as you're on the water up to the ordinary high water mark.  It fluctuates as it did on my boat ramp, it fluctuates according to the season.[39]

Mr. Dye however admits that he has seen the Narrows dry up to the point where you were able to drive a vehicle across the land.[40]  Mr. Dye testified that the deepest water in the

---

[36]    Doc. 34, Part 7, Affidavit of Terry Wilkinson, pg. 3.

[37]    Doc. 34, Part 3, Affidavit of Officer R. Kevin Steinke, pg. 8.

[38]    Doc. 36, Deposition of Ronald Dye, pg. 44.

[39]    Id. at pg. 24.

[40]    Id. at pg. 25.

Narrows on December 1, 2001 was between a foot and a foot and a half.[41]   During his deposition, Keith Dye also stated that he believed that the Narrows, particularly where he and his father were stopped on December 1, 2001, is not private property because it is a "waterway" that joins the Ocklawaha River.[42]

Mr. Dye also testified that during his employment at the Fly'n R Ranch, he had several conversations with Mr. Radcliff about the status of the Emeralda Marsh, the Narrows and the Ocklawaha River Basin.[43]   In particular, Mr. Dye testified that both a property attorney and the State Attorney's Office had advised him that he could not prevent persons from traveling through the Emeralda Marsh area if they were below the ordinary high water mark and he shared this information with Mr. Radcliff.[44]   According to Mr. Dye, Mr. Radcliff understood this information, nonetheless, Mr. Radcliff persisted in directing Mr. Dye, as his employee at that time, to exclude individuals from Emeralda Marsh, the Narrows, and the Ocklawaha River Basin.[45]

Mr. Dye stated that he does not know whether the officers were out on Mr. Radcliff's property on December 1, 2001 at Mr. Radcliff's request or not, but he thought that "we were

---

[41]     Id. at pg. 26.

[42]     Doc. 37, Deposition of Keith Dye, pg. 15.

[43]     Doc. 50, Appendix 12, Affidavit of Ronald Norman Dye.

[44]     Id.

[45]     Id.

10

being watched and [he] was going to get it before the year was over."[46]   Mr. Dye also

admitted that he did not believe that the officers were conspiring with Mr. Radcliff to try to

force him to sell his land to someone, including Mr. Radcliff.[47] Mr. Dye also does not know

of any agreement or plan between Mr. Radcliff and the Commission officers to have Mr.

Dye prosecuted under false means.[48]  However, Mr. Dye saw Commission vehicles on Mr.

Radcliff's property between the time he was stopped and arrested, and assumed that Mr.

Radcliff and the officers were discussing Mr. Dye.[49]  Mr. Dye testified that he thought Mr.

Radcliff was using the Commission and the arrest as a way  to get Mr. Dye to sell his land

or "destroy" him.[50]  But Mr. Dye did not think that the officers were in on the conspiracy and

that they were simply just trying to "harass" Mr. Dye and his son.[51]  Mr. Dye also thought

---

[46]     Doc. 36, Deposition of Ronald Dye, pg. 78.

[47]     Id.

[48]     Id. at pg. 114-15.

[49]     Id. at pg. 117.

[50]     Id. at pg. 79, 82.  Apparently, there is some friction between Mr. Dye and Mr. Radcliff
arising from a land deal between the two about a year prior to Mr. Dye's arrest.  At that time, Mr.
Dye was employed by Mr. Radcliff and there was some discussion of Mr. Dye selling 300 acres
of his property located near the Emeralda Marsh and the Fly'n R Ranch to Mr. Radcliff.   Mr.
Radcliff wanted to the buy the property for only $250,000 because Mr. Dye had previously "stole"
some 45 acres from Mr. Radcliff for only $18,000.  See Id. at pg. 86, 89.

[51]     Id. at pg. 79.

that Mr. Radcliff "set the Game Department up to arrest us for being back there [in the Narrows]."[52]

On March 4, 2002, in response to a warrant which was issued for Ronald Dye for one count of armed trespass, Ronald Dye turned himself in to the Lake County Jail.[53]

In April 2002, Officer Steinke spoke to the State Attorney's Office regarding the case against the Dyes.[54]   Officer Steinke took notes of the conversation, and stated that he "advised it was W. Radcliffs decision to prosecute - FWC was assisting [Radcliff] in this end."[55]   In a later conversation with the State Attorney's Office, Officer Steinke advised that "FWC doesn't oppose access" – presumably meaning that the Commission did not oppose the Dyes having access to the Narrows.[56]   In 2003, in a letter to Jim Antista, who is General Counsel for the Commission, Lieutenant Hahr stated that: "It was not FWC's decision to pursue trespass charges, it was the owner, Mr. Radcliff, who wished charges made [*sic*]. Mr. Radcliff came from out of state [and] reaffirmed this to us in person."[57]

---

[52]   Id. at pg. 115.

[53]   See Doc. 50, Appendix 10, Capias for Arrest of Ronald Norman Dye dated March 4, 2002; Doc. 50, Appendix 11, Arrest Affidavit/First Appearance Form dated March 4, 2002.

[54]   Doc. 50, Appendix 8, Notes taken by Officer Steinke on April 11, 2002.

[55]   Id.

[56]   Doc. 50, Appendix 8, Notes taken by Officer Steinke on April 25, 2002.

[57]   Doc. 50, Appendix 8, Letter from Lt. Hahr dated October 31, 2003.

On January 28, 2003, the criminal case against Ronald Norman Dye was dismissed

by The Honorable Mark J. Hill, Judge of the Fifth Judicial Circuit, Lake County, Florida.[58]

In dismissing the case, Judge Hill concluded that:

> On 1 December 2001 the Defendant Ronald Norman Dye was a riparian property owner of lands adjacent to the Emeralda Marsh which lands extended into the marsh and vested him with the right to travel the waters of Emeralda Marsh up to the ordinary high water mark.  At no time did he step from his boat onto the property of Will Radcliff or the Flyin' "R" Ranch.  His son, as his guest, is entitled to the same rights.  At the time of their stop and detention, each were well with in their rights to pass through the "Narrows" at or below the ordinary high water elevation.  Further, the Defendant's open, hostile, continuous and adverse use of the "Narrows" has established the Defendant's right to an easement through the "Narrows" by prescriptive right.[59]

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment

is appropriate only when the Court is satisfied that "there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  In

Celotex Corp. v. Catrett, the Supreme Court recognized that "the plain language of Rule

56(c) mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."[60]  The moving party bears the initial burden of establishing the

---

[58]     Doc. 50, Appendix 1, Findings of Fact, Conclusions of Law, and Order of Dismissal.

[59]     Id.

[60]     477 U.S. 317, 322 (1986).

nonexistence of a triable fact issue.  If the movant is successful on this score, the burden

of production shifts to the non-moving party who must then come forward with "sufficient

evidence of every element that he or she must prove."[61]  The non-moving party may not

simply rest on the pleadings, but must use affidavits, depositions, answers to

interrogatories, or other admissible evidence to demonstrate that a material fact issue

remains to be tried.[62]

## DISCUSSION

The Plaintiff alleges that Defendant Will Radcliff violated his civil rights under 42

U.S.C. § 1983 for his role in the unlawful arrest, imprisonment, and criminal prosecution

of the Plaintiff.  In particular, the Plaintiff alleges that the Defendant's actions denied the

Plaintiff of his right to due process by providing false information, denied him the right to

be free from illegal search and seizure when the Plaintiff was falsely arrested and

imprisoned, and denied him the right to liberty and move freely about his property, including

those properties of the sovereign pursuant to the Plaintiff's riparian rights.[63]

---

[61]    Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).

[62]    Celotex, 477 U.S. at 324.

[63]    See Doc. 2, Complaint, pg. 7-8.

14

To establish a prima facie case under 42 U.S.C. § 1983, the Plaintiff must prove that the Defendant deprived him of a right secured by the Constitution and laws of the United States, and that the Defendant acted under color of law. [64]

The Eleventh Circuit has set forth three primary tests to determine if a private actor is acting under color of law: (1) the public function test; (2) the state compulsion test; and (3) the nexus/joint action test.[65]  The Plaintiff claims that Defendant Will Radcliff acted under color of law because he was engaged in a "joint action" with Commission officers to violate the Plaintiff's constitutional rights.  This "joint action" can be established by proving that the Defendant was a "willful participant" with the State in an activity which violated the Plaintiff's rights.[66]  The Defendant, as a private actor, would be liable under this theory, however, only if there is a showing that his actions were "inextricably intertwined" with those of the Commission.[67]  A conspiracy between the State and Defendant Radcliff to

---

[64]     See 42 U.S.C. § 1983; Adickes v. Kress & Co., 398 U.S. 144, 150 (1970).

[65]     Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1277 (11th Cir. 2003).

[66]     See Dennis v. Sparks, 449 U.S. 24, 27 (1980).

[67]     See Brunette v. Humane Society of Venture County, 294 F.3d 1205, 1211 (9th Cir. 2002).  See also, Dennis, 449 U.S. at 28-29, where the Supreme Court held that "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge . . . [However] [p]rivate parties who corruptly conspire with a judge in connection with such conduct are . . . acting under color of state law within the meaning of § 1983."

violate the Plaintiff's constitutional rights may also satisfy the joint action test.[68]   The

Eleventh Circuit has held that:

> To establish a prima facie case of section 1983 conspiracy, a plaintiff must show, among other things, that the defendants 'reached an understanding to violate [his] rights.'  The plaintiff does not have to produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy, but must show some evidence of agreement between the defendants.   For a conspiracy claim to survive a motion for summary judgment '[a] mere 'scintilla' of evidence . . . will not suffice; there must be enough of a showing that the jury could reasonably find for that party.'[69]

The Court concludes that the Plaintiff has failed to show that Defendant Will Radcliff

acted under color of state law, so as to render him liable under § 1983.   Viewing the

evidence in a light most favorable to the Plaintiff, it appears that on multiple occasions the

Defendant complained to the Commission officers about the Plaintiff hunting in the Narrows

and the surrounding area, and the Defendant told the Commission officers and the State

Attorney that he wanted to pursue trespass charges against the Plaintiff.   These acts fall

short of establishing that the Defendant and Commission officers jointly acted to violate the

Plaintiff's civil rights.[70]   A private individual does not act under color of law merely because

---

[68]     See Adickes, 398 U.S. 150-52 (1970).

[69]     Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1283-84 (11th Cir. 2002) (internal citations omitted); see also Adickes, 398 U.S. at 152 (quoting United States v. Price, 383 U.S. 787, 794 (1966) ("'Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents.'")

[70]     See Lee v. Town of Estes Park, Colo., 820 F.2d 1112, 1115 (10th Cir. 1987).  In Lee, the Tenth Circuit held that a private individual who made a "citizen's arrest" because he believed
(continued...)

16

he elicits but does not join in the exercise of official state authority.[71]  In addition, reporting criminal activity to the law enforcement and filing a sworn complaint against an individual, which form the basis of an arrest, is not sufficient to make that party's act state action.[72] Moreover, the Commission officers' independent three-month investigation, which included Officer Steinke's inquiry into whether the Plaintiff was stopped within the boundaries of the Fly'n R Ranch and his communication with the state official charged with deciding whether the Narrows were navigable, further shows that the Commission officers did not jointly act with the Defendant to violate the Plaintiff's rights.  There is no evidence that Defendant Radcliff was involved with this investigation, other than consistently informing the officers that he wished to pursue charges.  Lastly, there is no evidence that the Commission officers and Defendant Will Radcliff had any agreement or plan to unlawfully arrest,

---

[70](...continued)
the plaintiff was a looter, transported the plaintiff to the police station, and reported the suspected criminal conduct to the police was not liable under § 1983 because he was neither a state actor, nor acting under color of state law.  Id.  In so deciding, the court noted that the individual "really did nothing more than report what he deemed to be criminal activity to the proper authorities" and there was no evidence that there was any prearranged plan between the individual and the police officer.  Id.  See also Carey v. Continental Airlines, Inc., 823 F.2d 1402, 1404 (10th Cir. 1987) (holding that airline employee's complaint about pilot's alleged trespass to city police officer, who arrested the pilot after questioning him, did not constitute state action for which employee could be held liable for under § 1983); White v. Scrivner Corp., 594 F.2d 140, 143-44 (5th Cir. 1979) (holding that there was no plan of concerted action and store employees were not acting under color of law where police conducted independent investigations before making arrests for shoplifting, where the police did not solely rely on employees' accusations, and where the employees were required to swear out a complaint prior to refiling of charges against a defendant); Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir.1992) (stating that in "[o]nly in rare circumstances can a private party be viewed as a 'state actor' for section 1983 purposes.").

[71]      Daniel v. Ferguson, 839 F.2d 1124, 1130 (5th Cir. 1988).

[72]      Id.

imprison, and prosecute the Plaintiff.  In fact, the Plaintiff admits that he knows of no such plan or agreement and the officers also testified that there was no such agreement.[73]

Even if Defendant Radcliff was out to "destroy" the Plaintiff, as he claims, the Defendant's purpose for complaining to the Commission and reason for pursuing charges against the Plaintiff does not show that Defendant Radcliff and the Commission officers conspired with one another to "destroy" the Plaintiff.  Additionally, even if Defendant Radcliff knew, as the Plaintiff claims, that the Plaintiff could not be successfully prosecuted for trespassing, the Plaintiff has still not shown that the Commission officers also believed that the Plaintiff could not be successfully prosecuted, and, nonetheless, the officers had an agreement with the Defendant to arrest and prosecute the Plaintiff anyway.

Since the Plaintiff's conspiracy claim against Defendant Radcliff fails, and he is therefore unable to establish that the Defendant acted under the color of law, any other substantive claims that the Plaintiff may have under § 1983 also must fail.[74]  Accordingly, the Defendant's motion for summary judgment with respect to the Plaintiff's § 1983 claim is due to be granted.

Because the Plaintiff's only federal claim has been resolved, and there is no diversity of citizenship, the Court is inclined to exercise its discretion and remand this case and its remaining state law claims to the state court from which it came for further consideration.

---

[73]    See Doc. 36, Deposition of Ronald Dye, pg. 78, 114-15; Doc. 34, Parts, 2-6, Affidavits of Officers Fisher, Steinke, Lambert, and Lieutenant Hahr.

[74]    See Rowe, 279 F.3d at 1284.

18

CONCLUSION

Accordingly, upon due consideration, it is ordered that:

(1) the Defendant's motion for summary judgment (Doc. 39) with respect to the Plaintiff's § 1983 claim is GRANTED;

(2) the Plaintiff's remaining state law claims are remanded to the state court; and

(3) the Clerk is directed to effectuate the remand, terminate any pending motions, and close the file in this matter.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 21st day of July, 2005.


_____

**UNITED STATES DISTRICT JUDGE**


Copies to:    Counsel of Record
              Maurya McSheehy